IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| TFC PARTNERS INC. d/b/a NFC AMENITY MANAGEMENT, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 1:19-cv-58 |
| STRATTON AMENITIES, LLC, GS RIO, LP d/b/a SEVEN APARTMENTS, SVF NORTHSHORE AUSTIN, LP d/b/a NORTHSHORE APARTMENTS, GREYSTAR REAL ESTATE PARTNERS, LLC, GREYSTAR MANAGEMENT COMPANY, JOLYNE D. SHEPARD, BENJAMIN F. ROBERTS, and SAIRA ESCAMILLA RUIZ | § § § § § § § § § § | |
| Defendants. | § | |

**<u>APPLICATION FOR TEMPORARY RESTRAINING ORDER</u>**

1. Pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, TFC Partners Inc. d/b/a NFC Amenity Management ("**NFC**") hereby moves for a temporary restraining order (i) enjoining Stratton Amenities, LLC ("**Stratton**"), Jolyne D. Shepard ("**Shepard**"), and Benjamin F. Roberts's ("**Roberts**") continued possession and misappropriation of NFC's trade secret information in violation of the Defend Trade Secrets Act of 2016 ("**DTSA**"), 18 U.S.C. §§ 1836, *et seq*., and the Texas Uniform Trade Secrets Act ("**TUTSA**"), Tex. Civ. Prac. & Rem. Code. ch. 134A; (ii) enjoining Shepard, Roberts, and Saira Escamilla Ruiz ("**Ruiz**") from continuing to violate their non-compete agreements with NFC by working for Stratton; and (iii) enjoining GS Rio, LP d/b/a Seven Apartments ("**Seven**"), SVF Northshore Austin, LP ("**Northshore**"), and Greystar Management Company and Greystar Real Estate Partners, LLC (collectively, "**Greystar**") from continuing to violate their non-compete agreements with NFC by employing, directly or indirectly, former key employees of NFC. As demonstrated below, this conduct, if not enjoined, will immediately and irreparably harm NFC.

## FACTUAL BACKGROUND

2. For purposes of brevity, NFC incorporates by reference herein the Original Verified Complaint filed on January 24, 2019 and the Declaration of Robert Cancel, attached hereto as Exhibit A ("**Decl.**"), outlining NFC's claims against Stratton, Shepard, Roberts, Ruiz, Seven, Northshore, and Greystar and the factual allegations in support.

## NFC IS ENTITLED TO A TEMPORARY RESTRAINING ORDER

3. Injunctive relief is available where the movant establishes: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest. *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009); *Intel Corp. v. Rais*, No. 1:19-cv-20-rp, 2019

WL 164958, at *3 (W.D. Tex. Jan. 10, 2019) (applying factors to TRO).

**A. Substantial Likelihood of Success on the Merits**

4.  To establish a substantial likelihood of success on the merits, "the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). The inquiry focuses solely on the substantive merits of the claim, not on any potential procedural obstacles. *Janvey v. Alguire*, 647 F.3d 585, 599 (5th Cir. 2011). Here, NFC has satisfied its burden.

**i.** *Claim for Violation of the DTSA and TUTSA Against Stratton, Shepard, and Roberts.*

5.  To establish a prima facie case for a violation of the DTSA and TUTSA, a plaintiff must show that the defendant misappropriated a trade secret causing damages to the plaintiff. 18 U.S.C. § 1836(b)(1); Tex. Civ. Prac. & Rem. Code. ch. 134A. Under the DTSA, the plaintiff must also show the trade secret is used in interstate commerce. 18 U.S.C. § 1836(b)(1).

6. NFC's trade secret information at issue, includes pricing structures, customer lists, operational procedures, trainings, methodology, financial information, budgets, employee compensation structures, labor distribution reports, and marketing strategies vital to its success in the amenity business. This information falls squarely within the definition of a "trade secret" under the DTSA and the TUTSA. *See* 18 U.S.C. § 1839(3) ("[A] 'trade secret' means . . . all forms and types of financial [and] business . . . information, including . . . compilations, . . . methods, techniques, processes, [and] procedures . . . if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value . . . from not being generally known to . . . another person who can obtain economic value from the . . . information."); Tex. Civ. Prac. & Rem. Code. § 134A.002(6) (same).

7. Moreover, NFC has taken reasonable measures to keep the information—which is not

generally known to other entities and provides NFC with a competitive advantage—secret. Specifically, NFC has (a) required incoming employees with access to this information, including Shepard, Roberts, and Ruiz, to acknowledge receipt of the NFC Employee Handbook, in which employees promise not to disclose or use any of NFC's trade secrets outside of their employment with NFC, (b) required such employees to sign a non-compete, in which employees promise not to be employed in a business competitive to NFC for one-year following separation and hold NFC's trade secret information in strict confidence, and (c) stored the information on a secure, password protected computer with limited accessibility. Decl. ¶¶ 6, 7, 17, 18. *See Intel Corp.*, 2019 WL 164958, at \*4 (holding managing electronic access to information and requiring employees to sign a confidentiality agreement were reasonable efforts to keep the trade secret information secret).

8. NFC's trade secrets derive independent economic value from not being generally known to other entities. NFC is the leading lifestyle and amenity management company in the nation with more than 260 clients (including 29 in Texas) and 2,000 employees, and has worked for ten years to build its reputation in the amenity business. Decl. ¶¶ 3, 4. NFC's trade secret information is vital to its business model. *See Hughes v. Age Indus., Ltd.*, No. 04-16-00693-CV, 2017 WL 943423, at \*11 (Tex. App.—San Antonio Mar. 8, 2017, no pet.) ("Pricing information and customer lists have been shown to be trade secrets.").

9. This information is used in interstate commerce by NFC—a Delaware entity with its principal place of business in New Jersey—which utilizes this trade secret information in its businesses in 16 states and Washington D.C. Decl. ¶ 12.

10. Defendants' use and/or disclosure of NFC's trade secrets falls squarely within the definition of a "misappropriation" under the DTSA and the TUTSA. *See* 18 U.S.C. § 1839(5)

(defining "misappropriation" as including "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who – (i) used improper means to acquire knowledge of the trade secret; [or] (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was – (I) derived from or through a person who had used improper means to acquire the trade secret; [or] (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret"); Tex. Civ. Prac. & Rem. Code § 134A.002(3) (same).

11. Shepard and Roberts have misappropriated NFC's trade secrets by using and disclosing NFC's trade secrets to allow Stratton to copy NFC's business model and to improperly compete with NFC.[1] As an Area Director, Shepard oversaw the day-to-day operations of all nine of NFC's properties in Austin and developed relationships with the property owners/managers at each of those sites. Decl. ¶¶ 25-27. Moreover, Shepard had knowledge of and access to NFC's highly confidential trade secret information with regard to those properties, such as operations strategies and employee pay rates and performance statistics. Decl. ¶¶ 29-30. After hiring Shepard in breach of her non-compete, Stratton is now actively and systematically attacking those nine NFC's properties in Austin by using the misappropriated information to undercut NFC's contractual relationships with its clients and poach additional NFC key employees in the Austin market. Decl. ¶¶ 43-114. In so doing, Stratton, who has knowledge of the non-competes, has

---

[1] Indeed, as explained more fully in the Cancel Declaration submitted herewith, Stratton broke into the amenities-management market and "developed" its business model by secretly and systematically poaching NFC's key employees in Dallas who had intimate knowledge of NFC's trade secrets, including its operational structure and strategies. Decl. at ¶¶ 86-114. Stratton is now perpetrating the same scheme in Austin.

boasted that there is nothing NFC can do to stop its conduct. Decl. ¶¶ 69, 70, 96, 106.

12.  Next, Shepard and Roberts used "improper means" to acquire NFC's trade secret information because their use and disclosure of the information was in breach of their duty under their non-compete agreements to maintain the secrecy of the information. Further, Stratton acquired NFC's trade secrets through "improper means," by improperly hiring Shepard and Roberts and inducing them to breach their duty to maintain the secrecy of NFC's trade secrets.

13.  As a direct, proximate, and foreseeable result of the misappropriation of NFC's trade secrets, NFC has been damaged through the loss of its amenity contracts with Seven, Northshore/Greystar, and the potential loss of the Whitley, a third Austin property. Decl. ¶¶ 45, 62, 86-87. Lost profit damages from these contracts continue to accrue. NFC can, therefore, establish a substantial likelihood of success on the merits on its misappropriation of trade secret claims under the DTSA and TUTSA.

ii. *Claim for Violation of Non-Compete Agreement Against Shepard, Roberts, and Ruiz.*

14.  Shepard, Roberts, and Ruiz's employment with Stratton is a breach of their respective non-compete agreements, pursuant to which each agreed "not to directly or indirectly compete with [NFC's] business . . . during the period of employment and for a period of 1 year following separation and notwithstanding the cause or reason for separation." Decl. Exs. 2, 13, 28. Shepard, Roberts, and Ruiz breached their non-compete agreements in late 2018 and early 2019 when they became employed by Stratton—a business that is substantially similar to and a competitor of NFC—within one year following separation with NFC.[2] As each employee is still well within the one-year non-compete term, the violations are ongoing.

---

[2] Roberts separated from employment with NFC on November 2, 2018, Shepard separated from employment with NFC on November 23, 2018, and Ruiz separated from employment with NFC on January 3, 2019. Decl. ¶¶ 44, 49, 71.

15.   In fact, on or before December 16, 2018, only a month after their separation from NFC, Shepard and Roberts both became employed with Stratton in violation of their one-year non-compete agreements. On December 16, 2018, both Shepard and Roberts were observed working for Stratton at Seven, and Roberts admitted that he was working for Stratton. Decl. ¶¶ 51, 53, 56.

16.   Similarly, Ruiz became employed within Stratton within a day following the effective date of her resignation from NFC. On January 4, 2019, after NFC had ceased performing services at Northshore and Northshore contracted with Stratton, Ruiz answered the phone, confirming that she became employed by Stratton within a month after her resignation. Decl. ¶ 73.

17.   NFC can, therefore, establish a substantial likelihood of success on the merits on its breach of contract claims against Shepard, Roberts, and Ruiz.

**iii. Claim for Violation of Non-Compete Agreement Against Seven and Greystar.**

18.   Seven and Northshore/Greystar's indirect employment of former NFC key employees through Stratton constitutes a breach of their non-compete agreements. Decl. at ¶¶ 35, 60-61. Pursuant to Seven and Northshore/Greystar's non-compete agreements, they agreed "during the term hereof and for a period of twelve (12) months following the termination of this Agreement, [not to] hire or employ [NFC's] Key Personnel in any capacity or for any function, including, for example, and without limitation . . . indirectly through an outside entity who in turn supplies such Key Personnel to [Seven or Northshore/Greystar]." Decl. Exs. 7 § 10 & 25 at Exhibit E. Although "Key Personnel" is not defined explicitly in Exhibit A to the agreements, the exhibit does list a number of positions including Concierge-Director (the position held by Roberts and Ruiz). Further, Shepard clearly qualifies as Key Personnel—she was a high-level employee at NFC with access to the exact type of trade secret information that the non-compete agreements are designed to protect. *See* Decl. ¶¶ 29-31.

19. In violation of their respective non-compete agreements, Seven began indirectly employing Shepard and Roberts and Northshore/Greystar began indirectly employing Ruiz within twelve months of her separation from NFC. In fact, on December 16, 2018, the last day NFC was to perform services at Seven before the December 17, 2018 effective date of Seven's termination of its contract with NFC, Shepard and Roberts were observed at Seven working for Stratton. Decl. ¶¶ 45, 51. Roberts admitted that he was working for Stratton at Seven on that date. Decl. ¶ 53.

20. Similarly, Northshore/Greystar began indirectly employing former NFC employees through Stratton within days following the effective date of its termination of its agreement with NFC on December 30, 2018. Stratton began employing Ruiz on or before January 4, 2019, when Ruiz answered the phone at the Northshore property on behalf of Stratton. Decl. ¶ 73.

21. Seven and Northshore/Greystar's employment of Shepard, Roberts, and Ruiz well within twelve months of terminating their agreements with NFC violated and continues to violate their non-compete agreements. NFC can, therefore, establish a substantial likelihood of success on the merits on its breach of contract claim against Seven and Northshore/Greystar.

**B. Irreparable Harm**

22. NFC will suffer irreparable harm without injunctive relief. Under Texas law, irreparable harm is presumed in cases where trade secrets have been misappropriated. *See, e.g.*, *IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 200 (Tex. App.—Ft. Worth 2005, no pet.) (noting that "[t]he threatened disclosure of trade secrets constitutes irreparable injury as a matter of law"). Additionally, if Stratton, Shepard, and Roberts are not enjoined from continuing to utilize NFC's trade secret information, NFC imminently risks losing customers beyond the customers it has already lost, including the Whitley, due to Stratton, Shepard, and Roberts's continued use of NFC's trade secret information. Decl. ¶¶ 86-87, 114. This risk is sufficient to

establish irreparable harm. *TransPerfect Translations, Inc. v. Leslie*, 594 F. Supp. 2d 742, 757 (S.D. Tex. 2009) (holding the "use of an employer's confidential information and the possible loss of customers is sufficient to establish irreparable harm"); *see also David v. Bache Halsey Stuart Shields, Inc.*, 630 S.W.2d 754, 757 (Tex. App.—Houston [1st Dist.] 1982, no writ).

23.   Further, courts frequently hold injunctive relief is proper when the trade secrets at issue were misappropriated from a former employer and are being used while the former employee is working for a direct competitor, which is the precise situation here. *FMC Corp. v. Varco Int'l, Inc.*, 677 F.2d 500, 504 (5th Cir. 1982) (holding that where former employee will be unable to prevent knowledge of plaintiff's trade secrets "from infiltrating his work . . . Texas has recognized the need for injunctive relief"); *Williams v. Compressor Eng'g Corp.*, 704 S.W.2d 469, 470 (Tex. App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.) ("[Where] a former employee is working for a direct competitor, no finding of irreparable harm is necessary to support a permanent injunction to protect trade secrets.").

24.   Moreover, NFC will suffer irreparable harm if Shepard, Roberts, Ruiz, Seven and Northshore/Greystar are not enjoined from continuing to breach their non-compete agreements with NFC. "In Texas, injury resulting from the breach of non-compete is the epitome of irreparable injury, so enforcement appears to be the rule rather than the exception." *See Sirius Computer Sols., Inc. v. Sparks*, 138 F. Supp. 3d 821, 841 (W.D. Tex. Oct. 5, 2015) (internal citations omitted); *McKissock, LLC v. Martin*, 267 F. Supp. 3d 841, 859 (W.D. Tex. Nov. 10, 2016) (holding that movant demonstrated irreparable injury where former employee received confidential information and sought to continue working for a competitor). Accordingly, "[p]roof that a highly trained employee is continuing to breach a non-competition [provision] gives rise to a rebuttable presumption that the applicant is suffering irreparable injury." *Sparks*, 138 F. Supp. 3d at 841.

25.   Lastly, Seven and Northshore/Greystar both contractually agreed that a breach of their non-compete agreements would subject NFC to irreparable harm. Exs. 7 & 25. Thus, the fact of irreparable harm from Seven and Northshore/Greystar's breach of their respective non-compete agreements should be beyond dispute.

## C. Balance of the Equities

26.   The balance of equities also weighs in favor of NFC. As a result of the defendants' continuing use NFC's trade secret information and breach of their respective non-compete agreements with NFC, NFC continues to suffer irreparable harm to its business operations and competitiveness in the market, substantial loss of customer goodwill, and loss of competitive use and value of NFC's confidential information and trade-secrets.

27.   Indeed, NFC has already lost its contracts with two properties in Austin and may lose a third—the Whitley. Decl. ¶¶ 45, 62, 86-87. NFC is at substantial risk of losing all nine properties that Shepard oversaw if Stratton is permitted to continue to employ NFC high-level employees and misappropriate NFC's trade secrets. Losing additional properties would jeopardize, if not destroy, NFC's presence, reputation, and good will in the Austin regional market.

28.   In contrast, Stratton, Shepard, and Roberts will not suffer undue hardship if they are enjoined from possessing, using, or disclosing NFC's trade secrets and confidential information that they are not authorized to possess, use, or disclose in the first instance. NFC simply seeks the entry of a TRO that protects NFC against unfair competition.

29.   Similarly, the hardship from enforcing the non-compete agreements is minimal, as Shepard, Roberts, and Ruiz would only be prohibited from being employed with a small number of companies that provide the same services as NFC—like Stratton—for a period of one-year from their separation of employment. Similarly, Seven and Northshore/Greystar would only be

prohibited from employing a small group of high-level employees for a period of one year.

30.  When the risk of injury from not issuing an injunction may jeopardize the plaintiff's competitive benefits obtained through its trade secrets and the risk of harm to a defendant from issuing an injunction is slight because the injunction will have reasonable restrictions, then the balance of equities favors issuing an injunction. *Picker Int'l, Inc. v. Blanton*, 756 F. Supp. 971, 983 (N.D. Tex. 1990); *McKissock*, 267 F. Supp. 3d at 860. Here, NFC risks losing over a decade of its efforts in creating its trade secret information due to Stratton's theft of NFC's trade secrets and key employees. Thus, the balance of equities weighs in favor of NFC.

**D. Public Interest**

31.  The entry of the requested TRO supports the public's interest in protecting trade secrets. *Picker Int'l*, 756 F. Supp. at 983 ("The public interest is served by protecting trade secrets."); *see also* H.R. REP. No. 114-529, at 6 (2016) (noting that the DTSA gives businesses "the tools they need to effectively protect their intellectual property and ensures continued growth and innovation in the American economy"). The public's interest will be also served by enforcing parties' contractual promises to protect confidential business information. *See Sirius Computer Sols.*, 138 F. Supp. 3d at 843.

**E. Notice**

32.  As set forth in the attached certificate, counsel for NFC has contacted all defendants.

<u>**PRAYER FOR RELIEF**</u>

NFC requests the Court enter a temporary restraining order as detailed in its proposed order. If required, NFC is willing and able to post reasonable bond as ordered by the Court, in support of any injunctive order issued by the Court.

Respectfully submitted,

V<small>INSON</small> & E<small>LKINS</small> L.L.P.


/s/ Marisa S. Secco
**Marisa Secco**
Texas Bar No. 24060583
**Michelle K. Arishita**
Texas Bar No. 24092048
2801 Via Fortuna, Suite 100
Austin, TX 78746-7568
Telephone: 512.542.8781
Facsimile: 512.236.3243
msecco@velaw.com
marishita@velaw.com


**Luanne Peterpaul**
NJ Bar # 029761983
*Pro hac vice* forthcoming
**Justin Kolbenschlag**
NJ Bar # 030882007
*Pro hac vice* forthcoming
501 Grand Ave., Ste. L1
Asbury Park, NJ 07712
Telephone: 732.455.8080
Facsimile: 732.676.7921
luanne@peterpaullaw.com
justin@peterpaullaw.com


*Attorneys for Plaintiff TFC Partners Inc. d/b/a*
*NFC Amenity Management*


## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of January, 2019, a true and correct copy of the foregoing document was tendered for filing to the Clerk of the U.S. District Court for the Western District of Texas using the Court's CM/ECF system.

/s/ Marisa S. Secco
Marisa S. Secco

## <u>CERTIFICATE REGARDING NOTICE</u>

I hereby certify that I provided notice of NFC's intent to file the foregoing document along with a copy of NFC's Verified Original Complaint to all parties on this 25th day of January, 2019, and will provide a true and correct copy of the foregoing document to all parties on the following business day, to these email addresses and physical addresses by FedEx.

Notice to Stratton Amenities, LLC provided to:

> Stratton Amenities, LLC
> 15455 Dallas Parkway
> Dallas, Texas 75001

> Mehdi Tazi
> 6302 Windcrest Drive #1018
> Plano, Texas 75024
> medhi@strattonamenities.com

> Mekki Bennis
> 3120 Brianna Drive
> Frisco, Texas 75033
> mekki@strattonamenities.com

Notice to GS Rio, LP d/b/a Seven Apartments provided to:

> GS Rio, LP d/b/a Seven Apartments
> c/o Katya Watson
> 615 West 7th Street
> Austin, Texas 78701
> kwatson@greystar.com

> C T Corporation System
> 1999 Bryan Street, Suite 900
> Dallas, Texas 75201

Notice to SVF Northshore Austin, LP, Greystar Management Company, and Greystar Real Estate Partners, LLC provided to:

> SVF Northshore Austin, LP
> 515 S. Flower Street, 49th Floor
> Los Angeles, California 90071

> Kim Piland, Property Manager
> Northshore Austin
> 110 San Antonio
> Austin, Texas 78701
> northshoreatxmgr@greystar.com

C T Corporation System
1999 Bryan Street, Suite 900
Dallas, Texas 75201

Greystar Real Estate Partners, LLC
18 Broad Street, Suite 300
Charleston, South Carolina 29401

The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801

Notice to Jolyne D. Shepard provided to:

Jolyne D. Shepard
1522 Westmeadow Trail
Round Rock, Texas 78665
jolyneshepard@gmail.com
jolyne@strattonamenities.com

Notice to Benjamin F. Roberts provided to:

2206 Hermia Street
Austin, Texas 78741
Gentelben2@yahoo.com

Notice to Saira Escamilla Ruiz provided to:

8800 South 1st Street, #1112
Austin, TX 78748
ruizsaira68@gmail.com

/s/ Marisa S. Secco
Marisa S. Secco