UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| TFC PARTNERS, INC. d/b/a NFC AMENITY MANAGEMENT, | § § § § | |
| Plaintiff, | § § | |
| v. | § § § | |
| STRATTON AMENITIES, LLC; GS RIO, LP d/b/a SEVEN APARTMENTS; SVF NORTHSHORE AUSTIN, LP d/b/a NORTHSHORE APARTMENTS; GREYSTAR REAL ESTATE PARTNERS, LLC; GREYSTAR MANAGEMENT COMPANY; JOLYNE D. SHEPARD; BENJAMIN F. ROBERTS; and SAIRA ESCAMILLA RUIZ; | § § § § § § § § § § § § | 1:19-CV-58-RP |
| Defendants. | § § | |

## **ORDER**

Before the Court is Plaintiff TFC Partners Inc. d/b/a NFC Amenity Management's ("NFC") Application for Temporary Restraining Order. (Dkt. 7). After considering the application, supporting evidence, and relevant law, the Court finds that the motion should be granted in part.

### I. BACKGROUND

NFC provides management services to amenity facilities, spas, and health clubs. (Compl., Dkt. 1, at 1). Defendant Stratton Amenities, LLC ("Stratton") is a rival that has recently begun hiring NFC employees and poaching NFC clients. (*Id.* at 10–28). The employees relevant to this action are Defendants Jolyne D. Shepard ("Shepard"), formerly the head of day-to-day operations for NFC's Austin clients; Benjamin Roberts ("Roberts"), NFC's former concierge director for Defendant

1

Seven Apartments ("Seven")[1]; and Saira Ruiz ("Ruiz"), NFC's former director at Defendant Northshore Apartments ("Northshore").[2] (*Id.* at 10–15, 16–20). The clients relevant to this action are Seven, Northshore, and the Whitley.[3] (*Id.* at 2). Seven and Northshore terminated their contracts with NFC effective December 2018; they are now under contract with Stratton. (*Id.* at 16, 18). Meanwhile, Greystar is contemplating terminating NFC's contract for the Whitley. (*Id.* at 23). Shepard, Roberts, and Ruiz all quit their jobs at NFC in November and December 2018. (*Id.* at 15, 19). All three now work for Stratton, with Roberts and Ruiz serving the same clients (Seven and Northshore, respectively) that they served at NFC. (*Id.* at 16, 20). Two other NFC employees, both at the Whitley, quit in early January 2019. (*Id.* at 21).

NFC's employees sign a non-compete agreement when hired; Shepard, Roberts, and Ruiz all signed one. (*Id.* at 10, 14 18–19). Those agreements provided that Shepard, Roberts, and Ruiz would not "be employed in a business substantially similar to or competitive with" NFC for a year after leaving NFC. (*E.g.*, *id.* at 10). Seven and Northshore also signed non-compete agreements with NFC. (*Id.* at 12–13, 17–18). Those agreements provided that Seven and Northshore would not employ "Key Personnel," directly or indirectly, within a year of terminating their contract with NFC. (*E.g.*, *id.* at 17–18).

NFC alleges that the defendants, in the course of their defections, have violated their non-compete agreements and misappropriated trade secrets. Against Shepard, Roberts, and Ruiz, NFC asserts causes of action for violations of the federal Defend Trade Secrets Act, 18 U.S.C. §§ 1836 *et seq.* ("DTSA"); violations of the Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code §§

---

[1] Seven Apartments is the business name for GS Rio, LP, a limited partnership headquartered in South Carolina. (Compl., Dkt. 1, at 3).

[2] Northshore Apartments is the business name for SVF Northshore Austin, LP, a limited partnership headquartered in California. (Compl., Dkt. 1, at 3). Defendant Greystar Real Estate Partners, LLC ("Greystar") is Northshore's property management company. (*Id.* at 17).

[3] Greystar is also the property manager for the Whitley. (Compl., Dkt. 1, at 20). The Whitley is not named as a defendant to this action.

134A.001 *et seq.* ("TUTSA"); and breach of contract. (Compl., Dkt. 1, at 28–38). Against Stratton, Shepard, and Robert, NFC asserts causes of action for tortious interference with consumer contracts, tortious interference with prospective business relationships, and conversion. (*Id.* at 38–41). Against Seven, Greystar, and Northshore, NFC asserts causes of action for breach of contract. (*Id.* at 33–35). Against Stratton, Shepard, Roberts, and Seven, NFC asserts a cause of action for civil conspiracy. (*Id.* at 41–42). Against Shepard and Roberts, NFC asserts causes of action for violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; violations of the Texas Harmful Access by Computer Act, Tex. Civ. Prac. & Rem. Code §§ 143.001 *et seq.*; and violations of the Texas Theft Liability Act, Tex. Civ. Prac. & Rem. Code §§ 134.001 *et seq.* (*Id.* at 42–44). And finally, against Stratton alone, NFC asserts causes of action for tortious interference with employee contracts, unjust enrichment, and money had and received. (*Id.* at 40, 45).

The day after it filed its complaint, NFC filed this motion for a temporary restraining order ("TRO"), in which it asks the Court to (a) enjoin Shepard, Roberts, Ruiz, Seven, Northshore, and Greystar from breaching their non-compete agreements; (b) enjoin Shepard, Roberts, and Ruiz from working for Stratton; (c) enjoin Stratton, Shepard, and Roberts from using or disclosing NFC's trade secrets, and (d) order Stratton, Shepard, and Roberts to return all documents containing trade secret information to NFC. (Proposed Order, Dkt. 7-1). NFC bases its request for a TRO only on its trade secrets and breach of contract claims. (TRO Appl., Dkt. 7, at 2–7).

## II. LEGAL STANDARD

The party moving for a TRO must establish "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009). To show a likelihood of success, the plaintiff must

present a prima facie case, but need not prove that he is entitled to summary judgment. *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). "A [TRO] is an extraordinary remedy and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements." *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008) (citation and quotation marks omitted). Upon reviewing NFC's motion, the Court concludes that NFC has is entitled to some, but not all, of the relief it seeks.

## III. DISCUSSION

### A. Misappropriation of Trade Secrets

NFC asks for temporary injunctive relief against Stratton, Shepard, and Roberts for violations of the DTSA and TUTSA. (TRO Appl., Dkt. 7, at 2–5). Under both the DTSA and TUTSA, a trade secret is defined as information the owner has taken reasonable measures to keep secret and which derives independent economic value from not being generally known or readily ascertainable through proper means. Tex. Civ. Prac. & Rem. Code § 134A.002(6); 18 U.S.C. § 1839(3). Misappropriation under both statutes includes (1) "disclosure or use of a trade secret of another without express or implied consent by a person who . . . used improper means to acquire knowledge of the trade secret" and (2) "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." Tex. Civ. Prac. & Rem. Code § 134A.002(3); 18 U.S.C. § 1839(5). "Improper means" include the "breach or inducement of a breach of a duty to maintain secrecy." Tex. Civ. Prac. & Rem. Code § 134A.002(2); 18 U.S.C. § 1839(6)(A).

NFC argues that its trade secret information at issue includes "pricing structures, customer lists, operational procedures, trainings, methodology, financial information, budgets, employee compensation structures, labor distribution reports, and marketing strategies." (TRO Appl., Dkt. 7, at 2). This sort of information can be a trade secret. *See* Tex. Civ. Prac. & Rem. Code § 134A.002(6)

4

(listing "business . . . information" such as "financial data [or a] list of actual or potential customers"); *Glob. Water Grp., Inc. v. Atchley*, 244 S.W.3d 924, 928 (Tex. App.—Dallas 2008, pet. denied) ("Customer lists, pricing information, client information, customer preferences, buyer contacts, blueprints, market strategies, and drawings have all been recognized as trade secrets.").

To determine whether a trade secret exists under Texas law, court examine:

> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of the measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003).[4] A trade secret must actually be a secret: the owner must take "reasonable measures under the circumstances to keep the information secret" and the information must derive economic value from not being generally known or readily ascertainable through proper means. Tex. Civ. Prac. & Rem. Code § 134A.002(6). "Consistent with this concept of secrecy, a former employee may use the general knowledge, skills, and experience acquired during employment to compete with a former employer." *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 467 (Tex. App.—Austin 2004, pet. denied).

Texas law provides that both actual and threatened misappropriation may be enjoined. Tex. Civ. Prac. & Rem. Code § 134A.003(a). Accordingly, the weight of case law supports the entry of an injunction upon a showing that a defendant probably, rather than actually, disclosed trade secrets. *See Cardoni v. Prosperity Bank*, 805 F.3d 573, 590 (5th Cir. 2015) (holding that a district court correctly "made an individualized assessment of whether disclosure had occurred or was likely to occur in this case"). Such a showing can be made by proving that a defendant is "in possession of the information and is in a position to use it."

---

[4] Not every factor will apply to a purported trade secret. *Glob. Water Grp.*, 244 S.W.3d at 928.

F*ox v. Tropical Warehouses, Inc.*, 121 S.W.3d 853, 860 (Tex. App.—Fort Worth 2003, no pet.); *see also Conley v. DSC Communications Corp.*, 05-98-01051-CV, 1999 WL 89955, at *5 (Tex. App.—Dallas Feb. 24, 1999, no pet.); *Rugen v. Interactive Bus. Sys., Inc.*, 864 S.W.2d 548, 552 (Tex. App.—Dallas 1993, no writ). The party claiming secrecy has the burden to prove secrecy. *Id.* At this preliminary stage, a court does not determine that the information at issue is a trade secret, only "whether the applicant has established that the information is entitled to trade-secret protection until the trial on the merits." *Ctr. for Econ. Justice v. Am. Ins. Ass'n*, 39 S.W.3d 337, 343 (Tex. App.—Austin 2001, no pet.).

The Court finds that NFC has proven a substantial likelihood that it will prevail on the merits of its TUTSA claim against Stratton, Shepard, and Roberts.[5] At this stage in the litigation, NFC has made a prima facie showing that its pricing structures, customer lists, policies and procedures, financial information, budgets, employee compensation structures, labor distribution reports, and marketing strategies are entitled to trade-secret protection.[6] NFC (1) requires employees to sign non-compete agreements and agree that they will not disclose confidential information, (2) maintains confidential information on a secure network, and (3) controls employee access to confidential information. (Cancel Aff., Dkt. 7-2, at 2–5). NFC's trade secret information is not made public, (*see id.* at 2), and holds value for competitors, who can use such information to undercut NFC's prices, target its customers and prospects, and recruit its employees. *See Fox*, 121 S.W.3d at 859; *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 22–23 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd).

---

[5] Because the Court finds that NFC is substantially likely to prevail on its TUTSA claims and NFC has not requested relief available under the DTSA but not the TUTSA, the Court need not consider whether NFC is entitled to temporary injunctive relief based on its DTSA claims.

[6] "That an order is issued granting trade secret protection [for purposes of a temporary injunction] does not mean the protected information is a trade secret." *Fox*, 121 S.W.3d at 858.

Moreover, there is a substantial likelihood that NFC will be able to prove that Stratton, Shepard, and Roberts have misappropriated these trade secrets. NFC has made a prima facie showing that Shepard and Roberts have probably used or disclosed some of these trade secrets and that Stratton has acquired some of these trade secrets with reason to know that the trade secret was acquired by improper means. Shepard and Roberts are doing the same work for Stratton that they did for NFC, in the same market—indeed, Roberts is doing the same job for the same client. (Cancel Aff., Dkt. 7-2, at 13). "Where there is a high degree of similarity between the employee's former and future employer, it becomes likely, although not certain, that the former's confidential information will be used and disclosed in the course of his work." *TransPerfect Translations, Inc. v. Leslie*, 594 F. Supp. 2d 742, 757 (S.D. Tex. 2009). Moreover, on her last day at NFC, Shepard sent financial information about NFC—profit and loss statements and ledgers for NFC's nine Austin properties—to her personal email account. (Cancel Supp. Aff., Dkt. 14, at 2). Stratton is aware of NFC's non-compete agreements, (Cancel Aff., Dkt. 7-2, at 22), and would likely understand that Shepard and Roberts were breaching a duty of confidentiality in using or disclosing trade secrets.

NFC has also established a substantial threat that irreparable harm will result if an injunction is not granted. "When a defendant possesses trade secrets and is in a position to use them, harm to the trade secret owner may be presumed." *IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 200 (Tex. App.—Fort Worth 2005, no pet.); *see also Williams v. Compressor Eng'g Corp.*, 704 S.W.2d 469, 470 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) ("[W]here the uncontradicted evidence shows that a former employee is working for a direct competitor, no finding of irreparable injury is necessary to support a permanent injunction to protect trade secrets."). Here, irreparable harm to NFC may be presumed

based on the prima facie evidence that Stratton, Shepard, and Roberts possess NFC's trade secrets and are in a position to use them.

Two of NFC's requests for relief pertain to its trade secrets claims: its request that the Court (a) enjoin Stratton, Shepard, and Roberts from using or disclosing NFC's trade secrets, and (b) order Stratton, Shepard, and Roberts to return all documents containing trade secret information to NFC. (Proposed Order, Dkt. 7-1).[7] The balance of harms tips in NFC's favor for this relief—NFC's potential loss of business and talent outweighs the burdens associated with complying with state law and returning property that belongs to NFC. Moreover, depriving Stratton of the allegedly misappropriated trade secrets serves the public interest by furthering the purposes of the TUTSA. A*HS Staffing, LLC v. Quest Staffing Group, Inc.*, 335 F. Supp. 3d 856, 874 (E.D. Tex. 2018). The Court will grant NFC this relief.

### B. Breach of Contract

NFC asks for temporary injunctive relief against Shepard, Roberts, Ruiz, Seven, and Greystar for breaching the non-compete clauses in their contracts with NFC. (TRO Appl., Dkt. 7, at 5–7). For Shepard, Roberts, and Ruiz, their non-compete agreements provided that would not "be employed in a business substantially similar to or competitive with" NFC for a year after leaving NFC. (Cancel Aff., Dkt. 7-2, at 5–6). For Seven and Greystar, their non-compete agreements provided that they would not employ "Key Personnel," directly or indirectly, within a year of terminating their contract with NFC. (*Id.* at 6–7). The Court finds that NFC has not shown a substantial likelihood of success on the merits at this early stage because the contracts, as written, as likely unenforceable because they are unreasonably broad.

---

[7] NFC's request to enjoin Shepard and Roberts from working for Stratton, (Proposed Order, Dkt. 7-1, 3), appears to derive from its breach of contract claims, not its trade secrets claims, because the request also includes Ruiz, who is not included in the requested relief explicitly derived from trade secrets claims, (*id.*). Nonetheless, the Court would not enjoin Shepard or Roberts from working for Stratton on the basis of NFC's trade secrets claims, as the balance of harms for this form of relief favors the defendants at this stage. They would be substantially prejudiced by being ordered to find new employment for the duration of this litigation, whereas the harm to NFC will be mitigated by the relief entered in this order.

In Texas, "[e]very contract . . . in restraint of trade or commerce is unlawful." Tex. Bus. & Com. Code § 15.05(a). "An agreement not to compete is in restraint of trade and therefore unenforceable . . . unless it is reasonable." *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 681 (Tex. 1990). By statute, covenants not to compete are reasonable—and therefore enforceable—only to the extent that they contain "limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." Tex. Bus. & Com. Code § 15.50(a).[8] "The hallmark of enforcement is whether or not the covenant is reasonable," *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 777 (Tex. 2011), and courts may "dispense[ ] with one or more factors entirely when the totality of circumstances indicate[ ] that the covenant not to compete [is] reasonably narrow to protect a company's business interest or goodwill." *M-I LLC v. Stelly*, 733 F. Supp. 2d 759, 799 (S.D. Tex. 2010).

"Generally, a reasonable area for purposes of a covenant not to compete is considered to be the territory in which the employee worked while in the employment of his employer." *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 793 (Tex. App.—Houston [1st Dist.] 2001, no pet.). Moreover, noncompete agreements barring an employee from working for a competitor in *any* capacity are invalid. *McNeilus Companies, Inc. v. Sams*, 971 S.W.2d 507, 511 (Tex. App.—Dallas 1997, no writ); *see also Wright v. Sport Supply Grp., Inc.*, 137 S.W.3d 289, 298 (Tex. App.—Beaumont 2004, no pet.) ("A restrictive covenant is unreasonable unless it bears some relation to the activities of the employee."). Where, as with Shepard, Roberts, and Ruiz, an employee's value is derived in large part from his or her customer relationships and the employer's business interest lies in preventing employees from using their client rapport to take business with them, a non-compete agreement is unreasonable when it extends to customers with whom the employee had no contact. *Peat Marwick*

---

[8] Section 15.50(a) also requires that a covenant not to compete be "ancillary to or part of an otherwise enforceable agreement at the time the agreement is made," but the parties do not dispute that the Agreement meets this requirement.

9

*Main & Co. v. Haass*, 818 S.W.2d 381, 386–88 (Tex. 1991); *Wright*, 137 S.W.3d at 298 ("[A] covenant not to compete that extends to clients with whom a salesman had no dealings during his employment is unenforceable.") (citing *Haass*, 818 S.W.2d at 386–88); *John R. Ray & Sons, Inc. v. Stroman*, 923 S.W.2d 80, 85 (Tex. App.—Houston [14th Dist.] 1996, writ denied) ("In the case of covenants applied to a personal services occupation, such as that of a salesman, a restraint on client solicitation is overbroad and unreasonable when it extends to clients with whom the employee had no dealings during his employment.") (citing *Haass*, 818 S.W.2d at 386–88).

The non-compete agreements at issue here are not limited in their geographic scope or in the scope of activities to which they apply. The agreements bar Shepard, Roberts, and Ruiz from working for an NFC competitor anywhere in the country, even if that competitor is based entirely outside of Austin. (Cancel Aff., Dkt. 7-2, at 5–6). That alone is likely enough to render the agreements unreasonable. *Butler*, 51 S.W.3d at 793. Moreover, the agreements also bar Shepard, Roberts, and Ruiz from working for a competitor in any capacity. (Cancel Aff., Dkt. 7-2, at 5–6). That, too, is generally unreasonable. *McNeilus Companies*, 971 S.W.2d at 511. Seven and Greystar, meanwhile, are barred from employing any NFC employees who qualify as "Key Personnel," even if those employees had no prior contact with Seven or Greystar, had never worked in the Austin area, or became employed in a different role than they had at NFC. (*Id.* at 6–7).[9] Such an agreement is likely unreasonable along several dimensions. *Butler*, 51 S.W.3d at 793; *McNeilus Companies*, 971 S.W.2d at 511; *Haass*, 818 S.W.2d at 386–88.

NFC does not articulate how these broad non-compete agreements are necessary to protect its business interests. Texas law does require courts to reform unreasonable agreements, Tex. Bus. & Com. Code § 15.51(c), and it is possible that one or more of the defendants might be in breach of a

---

[9] There is also uncertainty at this early stage as to whether Shepard, Roberts, and Ruiz—particularly Shepard—qualify as "Key Personnel" under Seven and Greystar's non-compete agreements. (*See* TRO Appl., Dkt. 7, at 6 (acknowledging that "Key Personnel" is not defined explicitly and that Shepard's position is not listed as an example in the exhibit to the agreement)).

10

reasonably reformed agreement.[10] However, NFC does not ask the Court to reform the agreements, nor does it present any argument as to what might constitute a reasonable reformation. Accordingly, NFC's likelihood of success must be based on the agreements as written, which are likely unenforceable. The Court finds that NFC is not entitled to temporary injunctive relief derived from its breach of contract claims.

## IV. CONCLUSION

For the reasons given above, the Court will only enter some of the injunctive relief requested by NFC. **IT IS THEREFORE ORDERED** that NFC's motion, (Dkt. 7), is **GRANTED IN PART**.

**IT IS FURTHER ORDERED** as follows:

1. Stratton, Shepard, and Roberts are enjoined from accessing, using, disclosing, distributing, disseminating, or discussing NFC's trade secret information, defined as NFC's pricing structures, customer lists, operational procedures, trainings, methodology, financial information, budgets, employee compensation structures, labor distribution reports, and marketing strategies.

2. Stratton, Shepard, and Roberts shall return to NFC all information, documents, and tangible things in their possession, custody, or control, whether in physical or digital format, including any copies thereof, that contain NFC's trade secret information.

3. All other relief not expressly granted is denied.

4. The Court will conduct a hearing on this matter on **February 12, 2019, at 10:00 a.m. CST**. The hearing will take place at the United States District Courthouse, 501 West Fifth Street, Courtroom 4, Austin, Texas 78701. Stratton, Shepard, and Roberts must appear and show cause why this temporary restraining order should not be extended.

---

[10] Agreements may be reformed at the preliminary injunction stage. *Tranter, Inc. v. Liss*, No. 02-13-00167-CV, 2014 WL 1257278, at *10 (Tex. App.—Fort Worth Mar. 27, 2014, no pet.).

5. All parties, including those defendants not subject to the TRO entered in this order, shall appear for a status conference on this matter on **February 12, 2019, at 9:30 a.m. CST**. The status conference will likewise take place in Courtroom 4 of the at the United States District Courthouse in Austin.

6. NFC must serve all defendants with this order on or before on **February 1, 2019**.

7. Unless extended by the Court, this order expires on **February 13, 2019, at 5 p.m. CST**. Fed. R. Civ. P 65(b)(2).

8. Pursuant to Federal Rule of Civil Procedure 65(c), NFC shall post a **$30,000.00** bond.

**SIGNED** on January 30, 2019.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE